SOUTHWESTERN OIL DEVELOPMENT CO. et al. v. ILLINOIS TORPEDO CO. et al. (No. 1459.)

(Court of Civil Appeals of Texas. El Paso. May 3, 1923. Rehearing Denied May 24, 1923.)

1. **Explosives** ⟐⟐10—Giving charge on contributory negligence of oil well owner in action for damages for premature explosion of nitroglycerine charge held error.

In an action against a torpedo company and one furnished by them to "shoot" a charge of nitroglycerine in an oil well to recover damages for a premature explosion of such charge, where it was shown that at a depth of 2,800 feet there was apparently some obstruction in the casing, but where the explosion in question occurred at a depth of only 2,100 or 2,200 feet, *held*, that it was error to give an instruction relating to the contributory negligence of plaintiff in permitting such obstruction in the casing, since it was below the point of the explosion and could not have caused it.

2. **Appeal and error** ⟐⟐500(2)—Where record does not show court's ruling on special exception not reviewable.

Where the record fails to show any action by the court upon a special exception addressed to a portion of the answer and to the admission of evidence relating thereto, *held*, that the matter could not be reviewed on appeal.

3. **Explosives** ⟐⟐10—Custom of torpedo company to "shoot" oil wells at owner's risk does not relieve from liability for negligence.

Though it is a custom among torpedo companies to shoot oil wells only at the owner's risk, such custom is no defense to a claim for damages resulting from the negligence of the company or its agent.

4. **Appeal and error** ⟐⟐1050(2)—Explosives ⟐⟐10—Admitting testimony of custom of shooting oil wells only at owner's risk held prejudicial error in action for damages for premature explosion.

In an action against a torpedo company and one furnished by it to shoot charges of nitroglycerine in an oil well for damages for a premature explosion, evidence of a custom among torpedo companies to shoot wells only at the risk of the owner, admitted only as bearing on the relation of agency between the codefendants, *held* immaterial on that issue, and its admission prejudicial error, in view of defendant's claim that such custom relieved it from liability.

5. **Appeal and error** ⟐⟐882(8)—Requesting charge to counteract evidence improperly admitted does not preclude complaining of admission thereof on appeal.

The fact that, after the admission of improper testimony, a special charge is requested which would in some degree counteract and minimize the original error, does not preclude the party requesting such charge from complaining of the error in the admission of such evidence on appeal.

Appeal from District Court, Eastland County; Geo. L. Davenport, Judge.

Action by the Southwestern Oil Development Company and others against the Illinois Torpedo Company and another. Judgment for defendants, and plaintiffs appeal. Reversed and remanded.

Ed. M. Whitaker, of El Paso, and Scott, Brelsford, Funderburk & Ferrell, of Eastland, for appellants.

Kirby, King & Overshiner, of Abilene, for appellees.

HIGGINS, J. The Southwestern Oil Development Company, hereinafter designated the oil company, brought this suit against the Illinois Torpedo Company, hereinafter designated torpedo company, and C. C. Rupert, to recover damages in the sum of $25,000 to an oil well occasioned by the premature explosion of a charge of nitroglycerine being placed in the well for the purpose of "shooting" it. Liability against both defendants was predicated upon the allegation that Rupert did the work and performed the alleged negligent act and that in doing so he was acting as the agent, within the scope of his authority, for the torpedo company.

The defendants answered by a general denial and special defenses setting up a custom prevailing in the vicinity of the well in question for torpedo companies to shoot wells at the well owner's risk; that the explosion, if premature, was brought about by the condition of the hole or the condition of the casing in the hole placed there by plaintiffs and concerning which defendants had no notice or knowledge and for such reason they were not liable for the premature shooting and resulting damages; that the explosion was the result of natural causes, not the fault of defendants; that defendants' business was that of selling nitroglycerine, and that it was their practice and custom to furnish a careful and experienced man to do the work of placing the nitroglycerine in the well, and that having done so they were no longer liable because the person so furnished, after going on the premises, became the agent of plaintiff, and if negligent then such negligence became that of the plaintiff; contributory negligence,

in furnishing defendant a hole in which to work, having obstructions and pipe with defects and splinters therein, all of which conditions were unknown to defendants, but known, or should have been known, to plaintiffs and which negligence was the proximate cause of the injury; an express or implied contract was alleged that the shots would be placed in the hole at the risk of the owner of the well, and still further alleged, in the alternative, that the explosion was the result of accident, over which defendants had no control.

Receivership proceedings intervened against the plaintiff, and its receiver, Reynolds, was substituted as plaintiff.

The case was submitted to a jury upon the general issue. Verdict was returned and judgment rendered for the defendants. There is practically no conflict in the evidence except as to the cause of the explosion.

The well was drilled to a depth of 3,328 feet. Casing had been set to a depth of about 2,915 feet. At that depth it rested upon solid formation, the remainder of the hole being in this formation. The inside diameter of the casing was .8 inches. Some days before the explosion in question a charge had been placed in the bottom of the well and exploded. This explosion caused a "bridge" in the hole at a depth of 3,260 feet. The term "bridge" refers to an obstruction of some kind. It was desired to place another charge of nitroglycerine resting upon the bridge and explode same. The charge was being placed when the explosion in question occurred.

The glycerine was purchased from the torpedo company who furnished the "shooter," Mr. Rupert, and his assistant Nentwig. The "shooter" places the charge. He also fires the same unless the explosion is produced by "hatching." A charge will explode spontaneously after it has remained in the well for a varying length of time, the explosion being produced by the heat in the hole. This is termed "hatching."

It is shown that the well for several hundred feet was filled with a fluid mixture of oil and water.

The process of placing the charge is as follows:

The glycerine is poured in cans about 3 feet 4 inches long and 7 inches in diameter. The bottom of the can is funnel shaped; the top is open. The first can is lowered to the bottom of the well, the next can rests upon the first, the cone of the second resting in the open top of the first. In like manner the other cans are placed until the desired amount of glycerine has been lowered.

The cans are lowered by means of a rope which passes over a pulley and is wound upon a reel placed near the hole, the reel and rope being furnished by the torpedo company. A new manilla three-eighth inch rope was being used in this instance. To the end of the rope a hook was attached. There is a bail upon the top of the can. The hook is inserted in the bail and the can lowered, the speed of descent being controlled by the "shooter" through a brake upon the reel. The hook has a "fish-belly" which shoves the bail to one side when the hook is disengaged.

The "shooter" may or may not detach the hook from the can before the can reaches the bottom of the hole. If it is detached before it reaches the bottom, it is said to be "floated." "Floating" is thus described: When the can in its descent strikes the fluid, the impact slackens the rope, which enables the "shooter" to disengage the hook from the bail, and the can by gravity sinks through the fluid to the bottom. The practice of "floating" is an approved method of lowering the can after it has reached the fluid, in fact, it seems that frequently the hook becomes disengaged when the can strikes the fluid and the "floating" process occurs independent of the will of the "shooter."[1]

Rupert lowered the first can to the "bridge," the hook not being disengaged until the can reached the "bridge." Another can was lowered and placed upon the first. Five more cans were lowered, when it was discovered that the last had stuck at a depth of about 2,800 feet. Fishing operations were then resorted to, and the five cans last lowered were removed; they having stuck at the depth indicated. When these cans were removed, it was found that the one which first stuck was injured by a puncture at the bottom through which the glycerine was leaking. After the five cans were removed, a seven-inch bailer was run in the well past the point where the cans had lodged to ascertain the condition of the hole. This operation disclosed no obstruction. Thereupon Rupert and his assistant proceeded to lower additional cans. Twelve cans had been lowered, and the thirteenth was being lowered. As it was descending, an explosion occurred which was recognized by all as premature and thereupon further operations were suspended. The exact depth at which this explosion occurred is not shown except by the evidence showing that upon pulling the casing every appearance indicated that it occurred between 2,100 and 2,200 feet. The evidence shows that shortly before the explosion there was about 1,000 feet of fluid in the hole and rising rapidly, so the explosion evidently occurred at or very near the water level.

The theory of the plaintiff, as disclosed by its evidence, was that prior to the time the thirteenth can reached the water the "shooter" negligently disengaged the hook; the can fell, and when it struck the water the impact caused the glycerine in the can to explode.

According to the testimony of Mr. Barkwell, field superintendent of the oil company, he was present when the charge was being placed and watching the operation when the

thirteenth can was being lowered. He testified that while the can was being lowered he saw Rupert manipulate the reel brake so as to cause a slack in the rope and execute the movement for disengaging the hook, and in from three to five seconds thereafter the explosion occurred. In this connection Barkwell also testified:

"Just prior to the explosion, when the reel was reeled out the last time, in reeling it back and forth across the reel, when it went over halfway, it jumped back up and come back to the other side instead of going clear across, and then, when it come back again, it made an offset in the reel of two thicknesses of the small cable, which makes one side of the reel smaller than the other. Some place near the middle was where this happened, and when the reel was reeled off the next time, of course when it dropped off of the big coil down on to the small coil the reel slowed up. Then Mr. Rupert went through the motion of unhooking the line, and shortly after that the explosion occurred—probably three or four or five seconds after that."

On the other hand, Rupert testified that he did not release the can in the hole above the fluid; that he was positive the can had reached and was in the fluid when he released it. Rupert was a "shooter" of many years' experience in that line of work, and he testified that it was a physical impossibility to release the can in an open hole at that depth because of the weight of the can and rope (about 100 pounds); that the hook could not be disengaged until there was a slack in the rope produced by the can reaching the fluid. Rupert also testified that the explosion occurred in five or six seconds after he released the can. He frankly admitted that he did not know what caused it to explode and did not "think any one could know that."

Nentwig, Rupert's assistant, and also an experienced shooter, at the date of trial corroborated Rupert, except he said the explosion occurred in from 10 to 30 seconds after Rupert executed the floating movement.

[1] The court submitted various defensive issues, one being a charge upon contributory negligence requested by defendant, as follows:

"Even though you should find and believe from the evidence in this case that the defendant C. C. Rupert was negligent in the manner and way in which he ran the thirteenth torpedo or glycerine charge in the well of plaintiffs, yet should you further find and believe from the evidence that the plaintiff was negligent in leaving or permitting obstructions in the hole or casing at the time defendant C. C. Rupert was called upon to shoot the hole, and that such negligence, if any, on the part of plaintiff, contributed to the injury complained of by plaintiff, then you will return your verdict for both defendants."

Error is assigned to the giving of the special charge upon contributory negligence. It is urged, together with other objections, that there was no evidence of contributory negligence.

The plea of contributory negligence is based upon the theory that the well contained obstructions and a pipe with defects and splinters therein. To support the plea appellees rely upon the evidence that some of the shells hung inside of the casing, and one of the shells was torn and leaking as if caused by contact with something inside of such casing, and the testimony of the shooter that in his opinion the leak was caused by a splinter or some obstruction in the casing, and evidence that contact of the nitroglycerine shell with such a splinter might cause it to explode.

If the five cans stuck and the bottom one caused to leak by some obstruction or splinter in the casing, then that defect was at a depth of about 2,800 feet. The explosion occurred at a depth of between 2,100 and 2,200 feet. There is no evidence of any defect or splinter in the casing at or above the depth the explosion occurred. If any presumption of that kind is to be indulged from the sticking of the cans and injury in the bottom of the lowest, such presumption would place the defect 600 feet below the point of explosion. A finding of contributory negligence in the particular pleaded would be based upon mere surmise. The evidence failing to raise the issue, it was prejudicial error to give the charge. Weisner v. Ry. (Tex. Com. App.) 207 S. W. 905; Ry. v. Wisenor, 66 Tex. 674, 2 S. W. 667; Tel. Co. v. Sanders, 107 Tex. 49, 172 S. W. 865.

This ruling renders it unnecessary to pass upon the objection to the charge relating to its form.

[2] The remaining propositions relate to the alleged action of the court in overruling a special exception addressed to that portion of the answer setting up a custom in that field of shooting wells at the owner's risk; of the admission of evidence of such custom, and of argument of defendants' counsel to the jury respecting such custom, one of the counsel saying to the jury:

"The plaintiffs are not entitled to a verdict in this case because the evidence shows that there was a general custom among torpedo companies to shoot all wells at the owner's risk, which custom the plaintiffs are presumed to have known and agreed to."

And other counsel for defendants saying to the jury:

"The plaintiffs are not entitled to a verdict in this case because the evidence shows the existence of a general custom in this vicinity for torpedo companies to shoot all wells at the well owner's risk."

The record fails to show any action by the court upon the exception, so there is nothing for this court to consider in regard to that matter.

A number of witnesses for defendants were permitted to testify over objection that in that field it was the custom to shoot wells at the owner's risk.

There appears in the record a special charge requested by plaintiff defining agency and an instruction to the effect that the evidence relating to this custom was not to be considered except as it might or might not bear upon the question of Rupert's agency. The record fails to show what action was taken by the court respecting the charge, but appellants in their brief admit it was given.

[3] In the briefs it is urged that a custom among torpedo companies to shoot oil wells only at the owner's risk is no defense to a claim for damages resulting from the negligence of the company or its agent. This is a sound proposition, for a mere custom cannot alter the rule of law which imposes liability for damages proximately resulting from tortious negligence; but that question is not presented because the court submitted no such defensive issue.

[4] When the evidence of custom was offered, the plaintiff objected to its admission for any purpose which objections were overruled and the evidence admitted. Such evidence was not material upon the issue of Rupert's agency. It neither tended to prove nor disprove the same, and its effect was prejudicial. Its evil effect was intensified by the argument made by defendants' counsel.

[5] The fact that appellants requested the charge limiting the jury in its consideration of such evidence to the issue of Rupert's agency does not preclude appellants from complaining of the introduction of the evidence. The evidence was improperly admitted over objection, and appellants' subsequent action in requesting a charge which would in some degree counteract and minimize the original error in its admission is not to be regarded as a waiver of the first error in admitting the same. In any event, the question should be considered upon its merits so that the error may not recur upon retrial.

Justice WALTHALL is disqualified and did not participate in this decision.

Reversed and remanded.